BOGAN ET AL., APPELLEES AND CROSS-APPELLANTS, *v.* PROGRESSIVE
CASUALTY INSURANCE CO., APPELLANT AND CROSS-APPELLEE.

[Cite as Bogan *v.* Progressive Cas. Ins. Co. (1988), 36 Ohio St. 3d 22.]

(No. 86-1696—Decided March 30, 1988.)

*Jacobson, Maynard, Tuschman &
Kalur, Richard W. Stuhr* and *Karen L.
Clouse,* for appellees and cross-
appellants.
*Thomas D. Hunter* and *Andrew W.
Cecil,* for appellant and cross-appellee.

HOLMES, J. Upon a review of the
policy terms before us, particularly
those relied upon by the parties and
which are set forth in their letters of
correspondence, it becomes apparent
that the issues in this case cannot be
resolved without determining the ef-
fectiveness of those preconditions to
underinsured motorist coverage con-
tained in Progressive's policy.
Specifically, we must consider the con-
sent to settlement clause, the extent to
which an injured party must exhaust
the underinsured's policy limits and
the extent to which the provider of
underinsured motorist coverage may
require protection of its subrogation
rights.

I

R.C. 3937.18(A)(2),[1] which man-
dates inclusion of underinsured
motorist coverage within policies of
motor vehicle liability insurance,

became effective October 1, 1982.
Prior to that time, insurers were re-
quired to merely offer underinsured
motorist coverage, which requirement
was set forth in R.C. 3937.181, effec-
tive June 25, 1980, and repealed effec-
tive October 1, 1982. This court has
had no opportunity to comment on a
number of the dilemmas created be-
tween the statutory requirements and
various insurance policy provisions in-
tended to effectuate the statute. This
has allowed a number of activities to
become prevalent in this area of legal
and insurance practice. We now con-
sider such practices.

As previously mentioned, the
Bogans sought Progressive's consent
to settle the case. Progressive implied-
ly refused to give such consent, setting
forth its reasons for doing so by letter
dated July 23, 1984. Accordingly, we
first consider that portion of Pro-
gressive's policy provisions which ex-
cludes underinsured motorist coverage
if the insured makes any settlement
with those potentially liable without
first obtaining the written consent of
the insurer.

There are of course a number of
considerations which militate in favor
of settlement between the underin-
sured tortfeasor's insurer and the in-
jured party. Obviously, settlement

---

[1] R.C. 3937.18(A)(2):
"(A) No automobile liability or motor
vehicle liability policy of insurance insuring
against loss resulting from liability imposed
by law for bodily injury or death suffered by
any person arising out of the ownership,
maintenance, or use of a motor vehicle shall
be delivered or issued for delivery in this
state with respect to any motor vehicle
registered or principally garaged in this
state unless both of the following are pro-
vided:
"* * *
"(2) Underinsured motorist coverage,
which shall be in an amount of coverage
equivalent to the automobile liability or

motor vehicle liability coverage and shall
provide protection for an insured against
loss for bodily injury, sickness, or disease,
including death, where the limits of
coverage available for payment to the in-
sured under all bodily injury liability bonds
and insurance policies covering persons
liable to the insured are less than the limits
for the insured's uninsured motorist cover-
age at the time of the accident. The limits of
liability for an insurer providing underin-
sured motorist coverage shall be the limits
of such coverage, less those amounts actual-
ly recovered under all applicable bodily in-
jury liability bonds and insurance policies
covering persons liable to the insured."

avoids litigation with its attendant expenses and resultant burden upon the legal system. Where the amount of settlement is less than the policy limits, the unpaid amount may well represent the savings in litigation costs for both sides. More importantly, settlement hastens the payment to the injured party who obviously needs compensation soon after the injuries when the medical expenses begin to amass and when the anxiety level is probably quite high. Additionally, there are many situations where litigation would not be a preferred course of action because, while the injuries are certain, there may remain other problems of proof. Thus, the public policy considerations, apart from the contract of the parties, generally favor settlements.

In the analysis of the issues *sub judice*, we note that this court has quite recently considered a consent clause, but in the context of an insurer's refusal to be bound by the outcome of litigation between the injured insured and the tortfeasor. In *Motorists Mut. Ins. Co.* v. *Handlovic* (1986), 23 Ohio St. 3d 179, 23 OBR 343, 492 N.E. 2d 417, the policy at issue provided underinsured motorist coverage. The provision relied upon stated, quite similarly to that in the present case, that the injured insured must obtain the insurer's written consent before he may litigate against the tortfeasor and that without such consent the insurer was not bound to provide underinsured motorist coverage. This court's judgment was that the avoidance of coverage by requiring such advance written consent was unreasonable under those circumstances and that the underinsured motorist insurance carrier, which had knowledge of the suit, was bound by the final judgment rendered in that case.

The present case presents a substantially similar advance consent requirement in the context of a settlement, rather than a judgment. We note, however, that the requirement of advance consent need not always be construed unfavorably. Although withholding advance consent to a court proceeding might not always be reasonable due to the presumptions accorded a trial and resulting judgment, nevertheless a different result might occur when the advance consent requirement is applied to a settlement between the injured insured and the tortfeasor. Clearly, a settlement is an *agreement* between such parties, subject to their negotiations, with a wider latitude of potential impact upon the provider of underinsured motorist coverage. Thus, where a provider of underinsured motorist coverage has reasonably refused to give advance consent, particularly in the context of a settlement, then the insured. is bound by the policy's advance written consent requirement. The issue of whether a provider of underinsured motorist coverage has unreasonably refused to grant advance consent for its insured to settle with the tortfeasor's insurance carrier and, relatedly, whether the policy requirement of advance consent is enforceable as a bar to underinsured motorist coverage is to be determined from the effects of the settlement, inclusive of the effects upon the rights of both the insured and the insurer. Having determined that an insurer may not avoid coverage by unreasonably refusing to consent to a settlement, we next inquire whether Progressive's reasons for refusing to consent to the settlement, as stated in its correspondence to the Bogans' counsel and set forth in its briefs upon the merits, were reasonable under the circumstances.

## II

Progressive asserts that it need

not have given its consent to any settlement which did not *exhaust* the Danielses' policy limits. The basis for this contention is to be found in Progressive's policy endorsement providing underinsured motorist coverage, which states, in pertinent part, that:

"The company shall not be obligated to make any payment * * * until after the limits of liability under [all other insurance policies] * * * have been *exhausted* by payment of judgments or settlements." (Emphasis added.)

Before construing this provision, we should point out that, although the exhaustion clause does not appear in the statutory mandate of underinsured motorist coverage, it seems to have been created in response to the possible implications of the language utilized in R.C. 3937.18(A)(2). Therein, underinsured motorist coverage is mandated in an amount equal to the automobile liability coverage of the policy "less those *amounts actually recovered* under all applicable * * * insurance policies * * *." (Emphasis added.) The direct implication of the emphasized language is that the coverage would appear to begin at the amount actually received from the underinsured tortfeasor's insurer regardless of whether the amount was determined and paid by the underinsured tortfeasor's carrier or voluntarily agreed upon by the injured party. By contractually eliminating this possible impact of the statute, insurers began their underinsured motorist coverage at the upper limits of the underinsured tortfeasor's policy. This effectively releases such insurers from providing coverage for amounts which the injured party could have received but for his voluntary decision to accept a lesser amount in settlement.

Having considered the necessity of the exhaustion clause to the underin-

sured motorist insurer, we now consider its implications to the insured who is also the injured party. The requirement of exhaustion appears to affect the injured party in two ways. First, the exhaustion requirement functions as a precondition to application of the underinsured motorist coverage. Progressive is not obligated and the claim is not matured under Progressive's policy until the exhaustion requirement is satisfied. Second, by its refusal to consent to any settlement which does not exhaust Nationwide's policy limits, Progressive has converted the exhaustion requirement into a precondition for its consent to settlement. Obviously, a determination of the reasonableness of withholding consent because of the exhaustion clause must turn upon whether the settlement proposed to Progressive satisfied the exhaustion requirement.

As previously mentioned, the term "exhaust" is not found in R.C. 3937.18(A)(2). Nevertheless, the court of appeals below determined that inclusion of this requirement within the underinsured motorist provision did not violate the statutory mandate since the requirement of exhaustion, strictly speaking, was applicable only to the timing of the policy's application and not the amounts recoverable under the underinsured motorist provision. This reading of both the statute and the provision appears reasonable.

The precise meaning of "exhaust," although not a legal term *per se,* would seem rather easily ascertained. Progressive quotes from Webster's New Third International Dictionary, Unabridged (1986), at 796, which defines "exhaust" as: "to use up the whole supply or store of: expend or consume entirely." Based upon this definition, Progressive asserts that the exhaustion requirement in its policy requires that the entire "bodily injury liability

limits of Nationwide's policy" must be paid to the Bogans.

While accepting the above definition as accurately describing the term at issue, we are compelled to disagree with so strict an application as that contended for by Progressive. As stated above, the objective of the exhaustion clause in the underinsured motorist insurance policy is quite clearly to absolve the insurer from liability for those uncollected amounts which were below the stated limits of the underinsured tortfeasor's policy. This goal was fully satisfied by the Bogans' written assertion that they would seek underinsured motorist coverage from Progressive only for those damages in excess of Nationwide's policy limits. Therefore, an injured insured satisfies the "exhaustion" requirement in the underinsured motorist provision of his liability insurance policy when he receives from the underinsured tortfeasor's insurance carrier a commitment to pay an amount in settlement, the injured party retaining the right to proceed against his underinsured motorist insurance carrier only for those amounts in excess of the tortfeasor's policy limits. The exhaustion clause must be construed as it was intended, *i.e.,* a threshold requirement and not a barrier to underinsured motorist insurance coverage. From the standpoint of Progressive, Nationwide's policy limits were exhausted when the Bogans voluntarily decided to treat the proffered settlement as a receipt of the entire policy limits for all applicable purposes.

We do not mean to suggest by the foregoing that an injured party may, voluntarily or otherwise, abandon his claim against the tortfeasor or his insurer and so proceed directly against the underinsured motorist insurer. The exhaustion clause, as construed herein, is a valid precondition to coverage under such policy.

Having concluded that the settlement proposed to Progressive by the Bogans satisfied the exhaustion clause, it becomes apparent that Progressive could not have reasonably withheld its consent to the settlement on the basis of such exhaustion clause. We therefore hold that a provider of underinsured motorist coverage has unreasonably withheld its consent to a settlement by its injured insured when the refusal to give consent was based upon the exhaustion clause in the policy as we have determined herein to have been fully satisfied. Under such circumstances, the failure to consent to the settlement violates public policy and the intent of the General Assembly as expressed in R.C. 3937.18(A)(2).

### III

Progressive also relies upon Part IV of its underinsured motorist insurance provision which is called the "Trust Agreement." This section, as set forth above, was specifically referred to by Progressive in its letter dated July 23, 1984. In essence, it establishes Progressive's rights of subrogation and, further, obligates the insured to "do whatever is proper to secure and * * * do nothing after loss to prejudice such rights." The direction taken by Progressive is therefore twofold, and mirrors the approach taken in considering the exhaustion clause. Progressive contends that it had every right to refuse to consent to a settlement, even supposing that the exhaustion clause was satisfied, if the proposed settlement compromised or destroyed its rights to be subrogated to its insured's claim as against the Danielses. Also, Progressive asserts that the actual terms of the settlement entered into by the Bogans did, in fact, destroy its subrogation rights against the Danielses, thus constituting a material breach of the Trust Agreement and thereby relieving Progres-

sive of its obligation to provide coverage. Again, the strength of both arguments can only derive from the reasonableness of the insurer in requiring that its rights of subrogation be protected.

The legal doctrine of subrogation has long been recognized as an insurer's derivative right. In the case of *Newcomb* v. *Cincinnati Ins. Co.* (1872), 22 Ohio St. 382, subrogation was defined as follows:

"Where a loss, covered by insurance, is occasioned by a wrong-doer, the underwriter, after reimbursing it in specie, or making compensation in money, is, in a proper case, entitled to be subrogated, *quoad hoc,* to the right of the assured against the wrong-doer. This is of the highest equity; for whereas the loss is, in the first instance, that of the insured, after reimbursement or compensation, it becomes the loss of the insurer." *Id.* at 387, relying upon the opinion of Lord Hardwick in *Randal* v. *Cockran* (1748), 1 Ves. Sen. 98, 27 Eng. Rep. 916.

This court has since reaffirmed its adherence to the legal doctrine of subrogation in various circumstances. See, *e.g., Federal Union Life Ins. Co.* v. *Deitsch* (1934), 127 Ohio St. 505, 189 N.E. 440 (subrogation to rights of mortgagee); *Aetna Cas. & Sur. Co.* v. *Hensgen* (1970), 22 Ohio St. 2d 83, 51 O.O. 2d 106, 258 N.E. 2d 237 (subrogee succeeds to rights of insured); *Centennial Ins. Co.* v. *Liberty Mut. Ins. Co.* (1980), 62 Ohio St. 2d 221, 16 O.O. 3d 251, 404 N.E. 2d 759 (excess insurer subrogated to rights against primary insurer); *James* v. *Michigan Mut. Ins. Co.* (1985), 18 Ohio St. 3d 386, 18 OBR 440, 481 N.E. 2d 272 (subrogation in case involving underinsured motorist); *Shealy* v. *Campbell* (1986), 20 Ohio St. 3d 23, 20 OBR 210, 485 N.E. 2d 701 (subrogation to contribution rights); *Theil* v. *Allstate Ins. Co.* (1986), 23 Ohio St. 3d 108, 114, 23 OBR 267, 272,

491 N.E. 2d 1121, 1126 (Holmes, J., dissenting; subrogation claim ordinarily available); *Motorists Mut. Ins. Co.* v. *Handlovic, supra,* 23 Ohio St. 3d at 184, 23 OBR at 347, 492 N.E. 2d at 421 (Douglas, J., concurring; full and final release destroys subrogation rights); *Federal Bank of Louisville* v. *Taggart* (1987), 31 Ohio St. 3d 8, 12, 31 OBR 6, 10, 508 N.E. 2d 152, 156 (accommodation party may be subrogated to rights of the holder of a promissory note).

Furthermore, in the context of the case before us, the right of subrogation is specifically granted to providers of uninsured/underinsured motorist coverage by the General Assembly. To that end, R.C. 3937.18(E) states, in pertinent part:

"In the event of payment to any person under the coverages required by this section and subject to the terms and conditions of such coverages, the insurer making such payment to the extent thereof is entitled to the proceeds of any settlement or judgment resulting from the exercise of any rights of recovery of such person against any person or organization legally responsible for the bodily injury or death for which such payment is made * * *." Of course, such right of subrogation would not encompass those amounts payable under the tortfeasor's insurance policy. See *James* v. *Michigan Mut. Ins. Co., supra,* 18 Ohio St. 3d at 388, 18 OBR at 442, 481 N.E. 2d at 274.

Based upon such established common law, and further strengthened by the specific statutory provision, R.C. 3937.18, we can only conclude that a subrogation clause is reasonably includable in contracts providing underinsured motorist insurance. Such clause is therefore both a valid and enforceable precondition to Progressive's duty to provide underinsured motorist coverage.

It is axiomatic to the doctrine of

subrogation that the rights of the insurer are no greater than those of the insured and, further, that a release, such as that granted by the Bogans in the case *sub judice,* is an effective defense against later actions by an insurer pursuant to its right of subrogation. See, *e.g., Automobile Ins. Co.* v. *Penn RR. Co.* (1938), 133 Ohio St. 449, 11 O.O. 148, 14 N.E. 2d 613; Annotation, Collision Insurance: Insured's Release of Tortfeasor before Settlement by Insurer as Releasing Insurer from Liability (1954), 38 A.L.R. 2d 1095 *et seq.*; 44 American Jurisprudence 2d (1982) 799, Insurance, Section 1810; 59 Ohio Jurisprudence 3d (1985), Insurance, Section 1223. See, also, *Handlovic, supra,* at 184, 23 OBR at 347, 492 N.E. 2d at 421, where the above rule is most recently set forth. Consequently, it is beyond dispute that the Bogans' grant of a full and final release to the Danielses effectively destroyed Progressive's subrogation right to recover from the Danielses any money paid to the Bogans. This court, in a number of its earlier opinions, has given an insured with uninsured and underinsured motorist coverage some leeway in proceedings to determine the issue of liability and insurance coverage without the specific consent of the insuring company, even where such consent is required by the provisions of the policy. In *Motorists Mut. Ins. Co.* v. *Handlovic, supra,* it was determined that an insured could proceed to bring an action against the tortfeasor without obtaining a consent to sue from his own underinsurance carrier, such proceeding not affecting the insurance coverage.[2] However, there remains a contractual duty of the insured not to settle with the tortfeasor without obtaining the consent of the insurer, where such settlement entails a complete release of the tortfeasor from all liability and, accordingly, destroys the insurer's right of subrogation. In the case *sub judice,* not only did the Bogans act without Progressive's consent, but they acted in the face of Progressive's flat refusal to contemplate any settlement that violated the terms of the Trust Agreement.

Notwithstanding the obviousness of the above maxims, the court of appeals stated:

"There is no indication of a *real and existing subrogation right* of defendant against the tort-feasor, that is, that the tort-feasor has assets with which to pay a judgment in excess of the policy limits of his liability insurance." (Emphasis added.)

Thus, it is argued, no action of the Bogans was prejudicial, as a practical matter, to Progressive's subrogation right since obtaining the reimbursement from the Danielses appears doubtful. Such view is mistaken both as a matter of law as well as the factual assumptions underlying the analysis.

Progressive's subrogation right, as previously demonstrated, is based not only upon the words of its contract, but

---

[2] We also point to the case of *Universal Underwriters Ins. Co.* v. *Shuff* (1981), 67 Ohio St. 2d 172, 21 O.O. 3d 108, 423 N.E. 2d 417, wherein the injured insured brought an action in the first instance against the tortfeasor and impleaded his uninsured insurance carrier, seeking a determination of whether the tortfeasor was an uninsured motorist under the policy. The action proceeded with the alleged tortfeasor being determined to be an uninsured motorist. The alleged tortfeasor was, however, determined by a jury not to be negligent. This court held that the matter of liability as determined by the jury was *res judicata* as to the issue of liability in a later but separate action by the injured party seeking arbitration with his uninsured motorist insurance carrier.

upon much prior case law and the specific statutory expression of the General Assembly. As such, a right of subrogation, the protection of which is a precondition to underinsured motorist coverage, is a full and present right in and of itself wholly independent of whether a later judgment obtained by use of such right will be reduced to collection from the tortfeasor. Such right constitutes a "real and existing" right at any time the injured insured is in a position to release a liable party from its liability. It is, therefore, both just and reasonable that an insurer require, as a precondition to coverage, not that such subrogation rights *will* result in reimbursement to the insurer, but that the injured party not compromise with the tortfeasor in such a way as to destroy the insurer's subrogation right. Such compromise clearly prejudices the present subrogation right of the injured party's insurer.

Accordingly, under the reasonable terms of the parties' own contract, the Bogans have failed to meet the crucial precondition of protecting Progressive's subrogation rights. By executing a release which precluded the insurer from exercising its subrogation rights, the Bogans materially breached the insurance contract. Progressive is therefore discharged from its obligation to provide underinsured motorist coverage.

Accordingly, the judgment of the court of appeals is reversed.

*Judgment reversed.*

MOYER, C.J., LOCHER and WRIGHT, JJ., concur.

H. BROWN, J., concurs in part and dissents in part.

SWEENEY and DOUGLAS, JJ., dissent.

H. BROWN, J., concurring in part and dissenting in part. The issues presented in this appeal are difficult to resolve. I believe the majority, in struggling with these difficulties, has rendered an opinion which lacks the clarity needed to resolve the controversies which are bound to arise in this area of the law.

The problem is that of the plaintiff who pays for and carries underinsured motorist coverage and is injured by a tortfeasor with low limits coverage. The majority opinion invites the two insurance carriers to whipsaw this type of plaintiff. The problem can best be seen hypothetically. Assume that a plaintiff, in a case of clear liability, suffers an injury having a value of $100,000. The tortfeasor has a $25,000 policy limit. The plaintiff has a $100,000 underinsurance policy limit. In this situation the plaintiff should be compensated. Yet, if the tortfeasor's carrier insists upon a release as a condition to its payment (which the carrier perhaps has a duty to do in order to protect its insured) and if the plaintiff's own carrier refuses consent to settlement with the tortfeasor (citing its subrogation rights), the plaintiff is unfairly trapped.

This dilemma was recognized by the court of appeals. Judge Alba Whiteside, speaking for a unanimous court, pointed the way out. His opinion states:

"There is no indication of a real and existing subrogation right of defendant against the tort-feasor, that is, that the tort-feasor has assets with which to pay a judgment in excess of the policy limits of his liability insurance. To the extent that the settlement and resultant release given by plaintiffs defeats a real and existing subrogation right of defendant, a breach of the policy provisions by plaintiffs could be found. Unfortunate-

ly, such issue was neither presented to, nor determined by, the trial court. Rather, that court held in reliance upon *Ruffing* [v. *Nationwide Mut. Ins. Co.* (Oct. 20, 1981), Franklin App. No. 81AP-241, unreported], *supra,* which is not applicable, that the giving of the release violated the consent and subrogation clauses, even in the absence of the evidence of actual prejudice to defendant as a result thereof. To this extent, the trial court erred in finding the consent clause effective to bar plaintiffs' claim for underinsurance benefits."

The majority, perhaps also sensitive to this dilemma, states in the first paragraph of the syllabus that "whether the policy requirement of advance consent is enforceable as a bar to underinsured motorist coverage, is *to be determined from the effects of the settlement,* inclusive of the effects upon the rights of both the insured and the insurer." (Emphasis added.) This appears to establish a rule of reason that would deny a plaintiff's underinsurance carrier the right to use its subrogation clause (which may be of no practical value) as a means to cut its policyholder off from coverage that has been purchased.

Since the above syllabus paragraph appears to establish a rule of reason, I could concur in that solution, although I think the direct approach to the subrogation problem, suggested by the court of appeals, is preferable. The second, third and fourth paragraphs of the syllabus state sound propositions of law and I concur in them.

The majority goes astray in the fifth paragraph of the syllabus, wherein an absolute rule is laid down which entitles the underinsurance carrier to withhold consent to settlement with the tortfeasor *in every case* where such carrier's subrogation rights are destroyed.

Such an inflexible rule allows the underinsurance carrier to avoid payment of its coverage by claiming a subrogation right that has no value. It puts the two insurance carriers in a position to thwart a recovery to which a plaintiff is clearly entitled.

As Justice Douglas points out in his dissent, demand for arbitration by the plaintiff is a possible solution. This is so, but I am reluctant to force the plaintiff into arbitration as the way out of the dilemma.

Accordingly, I would affirm the decision of the court of appeals.

DOUGLAS, J., dissenting. I respectfully dissent from the majority decision. I do so because I find the opinion to be confusing and internally contradictory. In addition, the majority's decision leaves unanswered several questions which have troubled insureds and insurers for a long time. The facts of the case at bar provide the opportunity to make definitive pronouncements on these issues. Instead, it is my fear that we have just further complicated the questions this case presents and that today's decision will lead to multifarious litigation between insured tortfeasors and their insurance carriers, between insureds and their underinsured motorist carriers and between the carriers of both insured tortfeasors and injured insureds.

The facts of this case are undisputed. The tortfeasor (Daniels) was the party negligent in the underlying accident. At the time of the accident, Daniels had $25,000 liability coverage with Nationwide. Further, the injured party (Bogan) was insured by a policy issued by Progressive which included *under*insured motorist coverage with a limit of $100,000. Thus, there was a substantial pool of insurance available to Bogan to compensate him for the injuries he suffered in the accident.

However, under the facts of this case (and many more cases like it), Bogan could obtain *none* of this money unless he sacrificed certain rights — a sacrifice that, in my judgment, was never really intended by the legislature. I believe that those provisions in Bogan's policy that bring about such an incongruous result are against public policy as being in violation of the clear intent of the General Assembly in enacting R.C. 3937.18.

The Progressive policy includes several provisions that I will set forth in detail and then jointly consider. For ease of description, these clauses can be identified as (1) consent to settle, (2) consent to sue, (3) exhaustion and (4) subrogation. In pertinent parts, the policy provides that: the uninsured (underinsured) motorist coverage does not apply "* * * to bodily injury to an insured with respect to which such insured * * * *without written consent of the company,* make[s] any settlement with any person * * * who may be legally liable therefor." (Emphasis added.) This is the "consent to settle" clause.

Next, we find that "[n]o judgment against any person * * * alleged to be legally responsible for the bodily injury shall be conclusive, as between the insured and the company, of the issues of liability * * * or of the amount of damages to which the insured is legally entitled unless such judgment is entered pursuant to an action prosecuted by the insured *with the written consent of the company."* (Emphasis added.) This is the "consent to sue" clause.

Related to these clauses is the "exhaustion" clause which provides that "[t]he company shall not be obligated to make any payment because of bodily injury to which this insurance applies and which arises out of the ownership * * * of an underinsured motor vehicle *until after* the limits of liability under all bodily injury liability bonds or insurance policies applicable at the time of the accident have been exhausted by payment of judgments or settlements." (Emphasis added.)

Finally, there is a standard subrogation clause which requires Bogan to "* * * hold in trust for the benefit of the company [Progressive] all rights of recovery which he shall have against such other person [Daniels] * * * because of the damages which are the subject of a claim made under this Part; * * *."

These clauses now can be applied, in narrative form, to the facts of this case — a case which is not unique. Bogan alleges damages exceeding $25,000. Nationwide, on behalf of Daniels, offers to settle for $21,000 in exchange, of course, for a *full* release of Daniels. It makes sense for Bogan to settle with Daniels for this amount because even if Bogan obtains a judgment against Daniels which exceeds $25,000, the most Nationwide will have to pay is $25,000. Given the uncertainty of prejudgment interest, there is no reason for Nationwide to settle for the full $25,000. It wants to "shave" something off the policy limits in exchange for an early settlement. Given the realities of the situation, Bogan agrees. Bogan then asks Progressive, pursuant to the "consent to settle" clause, for permission to settle. Progressive refuses consent. Bogan now has a choice. Settle with Daniels and Nationwide and lose any right to file a claim pursuant to the underinsured coverage in the Progressive policy or not settle and bring suit against Daniels. If Bogan elects to sue under the "consent to sue" clause in his policy with Progressive, his carrier will not be bound by any judgment Bogan gets against Daniels. But, see, *Motorists Mut. Ins. Co.* v.

*Handlovic* (1986), 23 Ohio St. 3d 179, 23 OBR 343, 492 N.E. 2d 417.

Conversely, if Bogan decides to settle and accepts the $21,000 from Nationwide, he will be in violation of both the "exhaustion" clause and the "subrogation" clause. Bogan has not exhausted the limits of Daniels' policy *and* he has been required to give a full release which would affect Progressive's subrogation rights against Daniels for any amount above $25,000 that Progressive might have to pay under Bogan's own underinsured coverage.

Thus, even if the full $25,000 were to be offered by Nationwide (an unlikely event given the realities), Bogan still cannot settle with Daniels because Progressive will refuse to consent on the basis that its subrogation rights against Daniels would be destroyed. In addition, Bogan cannot settle for less than the $25,000 offered because then he has not exhausted Daniels' policy limits with Nationwide. Pursuant to the Progressive policy, Bogan cannot sue Daniels to get a judgment binding on Progressive without first getting Progressive's consent.

This dilemma places Bogan in a sea of quicksand from which he cannot extricate himself. If he settles without consent, then he loses his underinsured coverage. If he does not settle and sues, then Progressive will contend the suit was without its consent and thus it is not bound by a judgment in Bogan's favor. Meanwhile, only Bogan (and to a lesser degree, Daniels) is being hurt by this whipsawing and it is he who has bought and paid for insurance coverage just to keep himself out of such a predicament.

Further complicating Bogan's position (and those similarly situated) is the so-called "twelve months" clause. Progressive's policy provides that "[n]o suit or action whatsoever or any proceeding * * * in arbitration shall be brought against the company for the recovery of any claim under this coverage unless as a condition precedent thereto, the insured * * * has fully complied with *all* of the *terms* of the policy and *unless same is commenced within twelve months next after the date of the accident.*" (Emphasis added.) The terms of the policy, of course, include exhaustion and subrogation. Given this court's express approval of such contractually shortened suit limitation clauses in *Colvin* v. *Globe American Cas. Co.* (1982), 69 Ohio St. 2d 293, 23 O.O. 3d 281, 432 N.E. 2d 167, and *Duriak* v. *Globe American Cas. Co.* (1986), 28 Ohio St. 3d 70, 71, 28 OBR 168, 169, 502 N.E. 2d 620, 622, this means that Bogan would have to bring about exhaustion of Daniels' policy limits without affecting Progressive's subrogation rights (an impossible task) before he could file any action against Progressive to recover pursuant to his underinsured coverage. Further, this impossible task must be accomplished within twelve months from the date of the accident. Obviously, if Bogan does not have Progressive's consent, he cannot exhaust Daniels' policy limits without affecting Progressive's subrogation rights. Therefore, these clauses take from an insured what the policy purports to give him and, thus, are in violation of the clear intent of R.C. 3937.18.

In my judgment, there is a solution. I would hold that where the clauses of a policy are in conflict and operate to deprive a policyholder of his rights, such clauses are void. Additionally, I would hold that a policyholder, in order to preserve his right to a trial by jury, may sue a tortfeasor without the consent of the policyholder's carrier and that, pursuant to *Handlovic, supra,* the carrier and the policyholder would be bound

by any judgment rendered. I would also permit the policyholder to proceed pursuant to the policy's arbitration clause. Since the amount due Bogan (if anything), pursuant to his underinsured coverage, is in dispute, arbitration is proper.

Permitting a policyholder to proceed in these ways places the burden where it rightfully belongs. Nationwide, in not paying its policy limits, runs the risk of a judgment being rendered in excess of the amount for which it could have settled on behalf of Daniels, thereby raising a possible bad-faith claim by Daniels. Likewise, Progressive runs the risk of being bound by a judgment as to both liability and damages without having the opportunity to contest either. Thus, the impetus given to the fair processing of a policyholder's claim would be compelling.

Accordingly, I would hold that a policyholder who is injured has the right to settle with the tortfeasor and to demand from his own company immediate arbitration of his claims. This would allow for speedy resolution of underinsured motorist claims without prejudice to either the policyholder or his insurance carrier. Since the majority decision does not provide such relief, I dissent.

SWEENEY, J., concurs in the foregoing dissenting opinion.